I agree that the motion to dismiss was properly granted, but not for all the reasons cited by the majority opinion. The alleged harm to the city is too remote to be recovered from the gun manufacturers. That is enough to dismiss the case. We should not make bad law that can be applied in other situations — perhaps an individual plaintiff with a products-liability claim — just to pound another nail in the coffin of this case.
I. The Majority Opinion Goes Too Far — And Will Hurt LegitimatePlaintiffs in the Future.
The majority opinion goes too far, and misstates the law in ways that I believe will haunt us in the future. Other cases not controlled by the remoteness doctrine will be affected by the majority's rulings on products liability, failure to warn, notice pleading, and other needlessly addressed issues. This case may bar the courthouse door to a plaintiff with legitimate claims in the future. That is why I must protest.
I write separately to state where I believe the majority is in error. But first I will state the issues on which I agree with the majority.
II. The Harm is Too Remote — We Must Draw the Line Somewhere.
The harm suffered by the city is too remote to sustain this lawsuit. For citizens who are injured by gunfire, the costs to the city are entirely derivative of the injuries to the citizens the city's claims flow from harm to the citizens, not to itself. As in the cases where courts rejected claims by union-benefit funds against tobacco companies, the city's claims are too remote.[1] For the expenses incurred by the city even when no other person suffers an injury, the city's claims do not meet the factors set out in Holmes v. Securities Investor ProtectionCorp.:[2] (1) the city's injuries are indirect and based on intervening factors, such as the conduct of gun owners, (2) recognizing claims would require the court to adopt complicated rules apportioning damages, and (3) directly injured citizens are in a better position to sue the manufacturers. At some point, a line must be drawn. The remoteness doctrine is a proper bar to recovery in this case.
III. The City Cannot Recover Public Expenditures in this Case — Itis Different from the Tobacco Cases.
Also, the city cannot recover public expenditures that it has a duty to provide. While it is true that a governmental entity may recover the cost of its services in certain instances, such as where recovery is permitted by statute or where the government incurs expenses to protect its own property,[3] this case is not one of them. This case involves expenditures — police and emergency services, health-care costs, court costs, social-services costs, and prison costs, for instance — that should be borne by the public as a whole. If we try to apportion each police run, or emergency run, or other costs implicated by this lawsuit, the expense would greatly exceed the recovery.
We note that this case can be distinguished from the litigation with which it is sometimes compared: the lawsuits brought by the states against tobacco companies, which resulted in a recent multi-billion-dollar settlement. The tobacco litigation involved claims to recover Medicaid payments made on behalf of victims of smoking. Under federal law, states must include procedures in their administration plans for recovering funds from third parties liable for injuries to Medicaid recipients.[4] In some states, such as Florida and Massachusetts, statutes authorized direct action against tobacco companies.[5] Other states had statutes that permitted recovery through subrogation. In an effort to avoid defenses available to the tobacco companies in subrogation suits, such as assumption of the risk, these states generally pursued equitable actions against the companies.[6]
Thus, in the tobacco litigation, the issue was not whether the states could recover public expenditures for Medicaid per se. Rather, the issue was whether the causes of action were viable means of recovery.
IV. Some Other Claims Would Not Survive Anyway.
Even if the lawsuit were not barred by the remoteness and public-expenditure doctrines, most claims would not survive. First, the city's negligence claims would fail. As a matter of law, no duty exists between the gun manufacturers and the city. There are too many intervening factors. Also, the city's nuisance claims could be dismissed. Nuisance law should not be expanded to include the design, marketing, or lawful sale of products. In addition, the city's unjust-enrichment claim would fail. It cannot be said that the city's provision of police, medical, and other services was a benefit conferred on the gun manufacturers that the city should have expected to get back, especially in light of the fact that the city provided those services in the performance of its governmental duties.
V. But Some Claims Are Proper — for Other Parties.
 A. The Products-Liability Defective-Design Claim Might Be Proper.
But I do take issue with various aspects of the majority's opinion, particularly with regard to the city's products-liability claims. Certainly, the prospect of a city suing gun manufacturers is a very controversial and politically charged issue, with potential staggering consequences for the manufacturers. But, with all the hoopla put aside, this case really boils down to nothing more than a lawsuit governed by the rules of civil procedure. Applying these rules, I disagree with the majority's conclusion that the city's products-liability claims fail because the city's complaint did not allege particular guns or defective conditions that caused direct injuries.
Notice pleading is still the law,[7] and the city clearly alleged that each defendant has manufactured defective products by failing to implement alternative safety designs. That was enough to give the manufacturers fair notice of the claims against them. Any further details could come out in discovery. Whether the city should or would succeed at trial, or even if the city would survive summary judgment, is not the issue. Rather, the issue is simply whether the city's allegations were sufficient to survive a motion to dismiss. Even if the pleadings were not adequately stated, the trial court should have given the city the opportunity to amend its complaint.[8] If the city's claims did not fail for remoteness, they would have survived. By stating otherwise, the majority bars the courthouse door to future parties with perhaps legitimate claims.
 B. The Products-Liability Failure-to-Warn Claim Might Succeed.
The majority believes that the city's failure-to-warn claims were properly dismissed based on the obvious dangers of handguns. It is true that certain risks associated with the use of guns are open and obvious. People know that guns fire bullets that can kill. But some of the city's allegations, such as the fact that a semi-automatic gun can hold a bullet in its chamber, even when the ammunition magazine is empty or removed from the gun, involve risks that are not necessarily open and obvious. That issue involves questions of fact, and, at least, more discovery is needed before it should be decided. Accepting the allegations in the complaint as true, as is required at this point, dismissal — for this reason — is premature.[9]
 C. Economic Loss Is Sufficient Harm.
Finally, I disagree with the majority's decision regarding economic losses for strict-products-liability claims. The Ohio Supreme Court has specified that a failure to allege other than economic damages does not destroy a products-liability claim, but rather removes it from the purview of the Products Liability Act.[10] Courts have also stated that common-law strict-liability claims for purely economic loss may be maintained as long as there is no privity of contract between the plaintiffs and defendants.[11] Thus, I believe that the majority incorrectly concludes that recovery under a products-liability claim is no longer permitted for economic loss alone. Although the Products Liability Act bars claims solely based on economic harm, certain claims may still be brought under the common law.[12]
VI. The Majority Makes the Right Decision — But for Some of theWrong Reasons.
Nevertheless, because the city's claims do not survive the remoteness and public-expenditure doctrines, the motion to dismiss was properly granted. But I believe the majority's misstatements on other issues will bring travail in the future.
Therefore, I concur in the court's judgment, but not in the opinion.
[1] See Laborers Local 17 Health Benefit Fund v. PhilipMorris, Inc. (C.A.2, 1999), 191 F.3d 229, certiorari denied (2000), ___ U.S. ___, 120 S.Ct. 799; Texas Carpenters Health BenefitFund v. Philip Morris, Inc. (C.A.5, 2000), 199 F.3d 788;Internatl. Brotherhood of Teamsters, Local 734 Health and WelfareTrust Fund v. Philip Morris, Inc. (C.A.7, 1999), 196 F.3d 818;Oregon Laborers-Employers Health Welfare Fund v. Philip Morris,Inc. (C.A.9, 1999), 185 F.3d 957, certiorari denied (2000) ___ U.S. ___, 120 S.Ct. 789; Steamfitters Local Union No. 420 Welfare Fundv. Philip Morris, Inc. (C.A.3, 1999), 171 F.3d 912, certiorari denied (2000), ___ U.S. ___, 120 S.Ct. 844.
[2] (1992), 503 U.S. 258, 269, 112 S.Ct. 1311, 1318.
[3] See Flagstaff v. Atchison, Topeka and Santa Fe Ry. Co.
(C.A.9, 1983), 719 F.2d 322, 324.
[4] See Section 1396a(25), Title 42, U.S.Code.
[5] See Fla.Stat.Ann. 409.910; Mass.Gen. Laws Ann., Chapter 118E, Section 22.
[6] See Sherrill, Tobacco Litigation: Medicaid Third Party Liability and Claims for Restitution (1997), 19 U.Ark. Little Rock L.J. 497.
[7] See Civ.R. 8.
[8] See State ex. rel. Huntington Ins. Agency v. Duryee
(1995), 73 Ohio St.3d 530, 533, 653 N.E.2d 349, 353 (liberal amendment of pleadings).
[9] See White v. Smith Wesson (Mar. 14, 2000), N.D.Ohio No. 1:99 CV 1134, unreported ("This Court cannot say as a matter of law that it is an `open and obvious risk' or a matter of common knowledge that handguns would be used by some individuals, e.g., children, to harm themselves or others, and that a proper warning or instruction would not be used by a manufacturer exercising reasonable care. Whether the manufacturer Defendants prevail on their `open and obvious risk' defense is a matter of fact for the jury to decide.").
[10] See LaPuma v. Collinwood Concrete (1996), 75 Ohio St.3d 64,661 N.E.2d 714, syllabus.
[11] See Nadel v. Burger King Corp. (1997), 119 Ohio App.3d 578,585, 695 N.E.2d 1185, fn. 3; Chemtrol Adhesives, Inc. v.American Manuf. Mut. Ins. Co. (1989), 42 Ohio St.3d 40, 49,537 N.E.2d 624, 634 (citing Iacono v. Anderson Concrete Corp. [1975],42 Ohio St.2d 88, 326 N.E.2d 267; Inglis v. American Motors Corp.
[1965], 3 Ohio St.2d 132, 209 N.E.2d 583).
[12] See Carrel v. Allied Prods. Corp. (1997), 78 Ohio St.3d 284,289, 677 N.E.2d 795, 800 (common-law products-liability actions survive the enactment of the Products Liability Act, unless specifically covered by the act); White v. DePuy, Inc.
(1998), 129 Ohio App.3d 472, 480, 718 N.E.2d 450, 455 (common-law theory of implied warranty, or strict liability, survives the enactment of the Products Liability Act).